**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **A2K, INC.** | |
| **Plaintiff,** | |
| **v.** | **No.** |
| **FLUOR CORPORATION d/b/a FLUOR MISSION SOLUTIONS, AND B&H CLAIMS SERVICE, INC.** | |
| **Defendants.** | |

## COMPLAINT

A2K, Inc. ("Plaintiff" or "A2K"), upon personal knowledge as to the facts pertaining to itself and its employees, upon information and belief as to all other matters, and upon the investigation of counsel, brings this complaint to recover treble damages, injunctive relief, and all other relief as appropriate, based on violations of federal antitrust laws and common laws against Defendants: (1) Fluor Corporation d/b/a Fluor Mission Solutions ("Fluor"), and (2) B&H Claims Service, Inc. ("B&H"), collectively, "Defendants."

**TABLE OF CONTENTS**

GLOSSARY ............................................................................................................ iv

I.      INTRODUCTION ......................................................................................... 1

II.     PARTIES, JURISDICTION AND VENUE ................................................. 3

        A.      The Parties ........................................................................................ 3

        B.      Jurisdiction and Venue ..................................................................... 4

III.    FACTUAL BACKGROUND ........................................................................ 5

        A.      A2K's Historical Relationship with Fluor ....................................... 5

        B.      Fluor's Exclusive Prime Contract with FEMA ................................ 5

        C.      A2K's Subcontract with Fluor Under the Fluor Prime Contract ...... 6

        D.      Fluor Processes for Preparing for and Responding to FEMA PA TAC
                Task Orders ....................................................................................... 7

        E.      The HPCC Fires and FEMA PA TAC Contracts .............................. 8

        F.      Fluor Becomes the Only Prime Contractor for the HPCC Fires; Fluor
                requests A2K to onboard additional TAC; and TACs Request to Work
                with A2K Under Fluor's IDIQ Contract. ........................................... 9

        G.      Unbeknownst to A2K, B&H and Fluor Conspired to Steal A2K-Aligned
                TACs and Force the TACs to Work for Other Fluor Subcontractors,
                Including B&H, or Not Work at All. ................................................. 11

        H.      Fluor Stole A2K-Aligned TACs and Realigned Them With B&H and
                Other Fluor Subcontractors Against the Will of A2K and A2K-Aligned
                TACs. ............................................................................................... 16

        I.      Fluor Punishes A2K for Alleged Violation of Fluor's TAC Onboarding
                Policy As Pretense to Bar A2K from Competing in the East Coast Disaster
                Relief Market. .................................................................................. 18

        J.      Fluor Formally Restricts A2K's Participation in the Disaster Recovery
                Market. ............................................................................................ 21

        K.      Fluor Stole A2K-Aligned TACs from A2K and Required Those TACs to
                Deploy with B&H or Other Fluor Subcontractors. .......................... 22

IV.     CLAIMS FOR RELIEF ...................................................................................23

        Count I          Fluor and B&H's Conspiracy to Monopolize in Violation of Sherman Act
                         Section 1 (15 U.S.C. § 1) ...........................................................................23

        Count II         Fluor and B&H's Conspiracy to Monopolize in Violation of Sherman Act
                         Section 2 (15 U.S.C. § 2) ...........................................................................24

        Count III        Fluor's Breach of Contract.........................................................................26

        Count IV         B&H's Unjust Enrichment..........................................................................27

        Count V          Detrimental Reliance on Fluor's Promises .................................................29

        Count VI         Fluor and B&H's Tortious Interference with an Existing Contract...........30

        Count VII        Fluor and B&H's Tortious Interference with a Prospective Contract .......32

        Count VIII       Fluor's Intentional Fraud ...........................................................................35

        Count IX         Fluor's Negligent Misrepresentation ..........................................................37

        Count X          Fluor and B&H's Civil Conspiracy ...........................................................38

        Count XI         Fluor and B&H's Defamation.....................................................................39

        Count XII        Fluor and B&H's Business Disparagement .................................................40

        Count XIII       B&H's Unfair Competition by Common Law Misappropriation.............41

V.      PRAYER FOR RELIEF .................................................................................42

VI.     JURY TRIAL DEMANDED ..........................................................................43

| PLAINTIFF'S GLOSSARY | |
|---|---|
| **Term** | **Definition** |
| A2K; Plaintiff | A2K, Inc., the Plaintiff in this Action and a Subcontractor to Fluor |
| A2K Contract | The subcontract between A2K and Fluor (doing business as Mission Solutions), contract number FEMAV-A2K1, with a one-year base period and four one-year option periods, under which A2K provided TACs to support FEMA Task Orders. |
| Aligned<br><br>(*e.g.*, A2K-Aligned) | The status by which a TAC is listed on and associated with a particular Fluor subcontractor's roster (*e.g.*, "A2K-Aligned" if with A2K), tracked in Fluor's FEMAP system, which determines which subcontractor receives mobilization orders for that TAC. |
| B&H | B&H Claims Service, Inc., a defendant and subcontractor entity who conspired with Fluor to realign A2K-aligned TACs |
| CCPRS | CH2M Hill – CDM PA TAC Recovery Services, a separate FEMA PA TAC prime contractor with a separate IDIQ contract with FEMA, also known as PA TAC IV the "CCPRS Prime Contract" |
| CCPRS Prime Contract<br>(a/k/a PA TAC IV) | CCPRS's separate FEMA Public Assistance Technical Assistance Contract IV prime contract under which CCPRS initially supported the HPCC Fires; also referred to as the "PA TAC IV." |
| Defendants | Fluor Corporation d/b/a Fluor Mission Solutions ("Fluor") and B&H Claims Service, Inc. ("B&H") |
| Demobilized | The status of a TAC who is no longer assigned to work under a particular Task Order or prime contract (*e.g.*, CCPRS TACs were demobilized when the CCPRS Prime Contract ended for HPCC) |
| DTPA | The Texas Deceptive Trade Practices–Consumer Protection Act, TEX. BUS. & COM. CODE § 17.41 *et seq.*, cited in Count V concerning deceptive and unfair trade practices. |
| East Zone | The geographic area for which Fluor holds the PA TAC V IDIQ prime contract, encompassing FEMA Regions 3 and 4 and Headquarters Task Orders. |
| East Zone disaster relief work market | The alleged relevant market in which Fluor is said to possess monopoly power or a dangerous probability of achieving it under the PA TAC V East Zone prime contract. |

| PLAINTIFF'S GLOSSARY | |
|---|---|
| **Term** | **Definition** |
| FEMA (Federal Emergency Management Agency) | The Federal Emergency Management Agency, an executive branch agency responsible for coordinating federal disaster response and administering programs including Public Assistance. |
| FEMAP (Fluor Emergency Management Assistance Portal) | Fluor's online subcontractor management portal used to confirm and track TAC roster alignment and eligibility for deployment. |
| Federal Disaster Recovery Servicing Market | The market alleged in the complaint in which Defendants' conduct excluded A2K, centered on staffing specialized TACs for FEMA Public Assistance deployments. |
| Fluor | Fluor Corporation, doing business as Fluor Mission Solutions; defendant and FEMA PA TAC V East Zone prime contractor. |
| Fluor Code of Business Conduct and Ethics | Fluor's Code of Business Conduct & Ethics circulated to its subcontractors, including a directive not to make false or misleading disparaging statements about competitors. |
| Fluor Prime Contract (the PA TAC V) | Fluor's FEMA Public Assistance Technical Assistance Contract V (the PA TAC V) for the East Zone, pursuant to which Fluor provides indefinite delivery/indefinite quantity (IDIQ) work under FEMA Headquarters Task Orders, with a one-year base period and four one-year option periods, including for the Hermit's Peak/Calf Canyon Fires ("HPCC Fires"). |
| HPCC Fires (Hermit's Peak/Calf Canyon Fires) | The Hermit's Peak/Calf Canyon Fires in New Mexico, for which FEMA issued Task Orders under PA TAC contracts to deploy TACs; the disaster context underlying the alleged conduct. |
| HPFAA (Hermit's Peak Fire Assistance Act) | The Hermit's Peak Fire Assistance Act, a federal statute providing expedited funding for HPCC-related claims through FEMA. |
| IDIQ (indefinite delivery/indefinite quantity) | An indefinite delivery/indefinite quantity contracting vehicle used by FEMA for PA TAC IV and V, including Fluor's East Zone PA TAC V prime contract. |

| PLAINTIFF'S GLOSSARY | |
|---|---|
| **Term** | **Definition** |
| Mission Solutions | The Fluor division through which Fluor performed the PA TAC work referenced in the Complaint. |
| Mobilization Orders; Mobilize | Orders Fluor issues to the aligned subcontractor for a selected TAC to deploy under a FEMA Task Order; "Mobilize" refers to assigning and sending a TAC to the work. |
| Options; Option Periods | The four one-year option periods following the one-year base period within Fluor's Prime Contract (the PA TAC V) and mirrored in the A2K Contract. |
| Public Assistance Program | FEMA's statutory program providing supplemental assistance to eligible public entities for disaster response and recovery costs, administered under the Stafford Act. |
| Stafford Act | The Robert T. Stafford Disaster Relief and Emergency Assistance Act, the federal disaster statute under which FEMA administers Public Assistance, including Section 406. |
| TAC; Technical Assistance Contractor | A contract staff member with specialized professional or technical skills (*e.g.*, engineering, cost estimating, policy analysis, insurance) supporting FEMA's administration of Public Assistance under PA TAC contracts with various contractors (like A2K), who contract with prime contractors like Fluor. |
| TAC Contracts | Written or verbal independent contractor agreements between A2K and TACs |
| Task Order | A FEMA request issued to a PA TAC prime contractor for TACs with specific skills; primes then identify, select, and mobilize aligned TACs via subcontractors to fulfill the order. |

## I.    INTRODUCTION

1.    FEMA is an executive branch agency of the federal government responsible for ensuring a comprehensive and coordinated federal response to disasters and emergencies, providing necessary support to disaster survivors and helping to prevent future disasters. *Stafford Act*, FED. EMERGENCY MGMT. AGENCY, https://www.fema.gov/disaster/stafford-act (last visited Jan. 2, 2026). FEMA's work includes administering the statutorily authorized Public Assistance Program to provide supplemental grant assistance to governments and certain private non-profit entities for costs incurred responding to and recovering from a Presidentially-declared disaster. Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5170–5189.

2.    FEMA utilizes federal employees to administer the Public Assistance Program. FEMA supplements the federal workforce with contractor staff that have the skills to provide specialized professional and technical services in support of administration of the Public Assistance Program. A contract staff member is known as a Technical Assistance Contractor ("TAC"). Examples of specialized professional and technical services provided by TACs include architectural, engineering, cost estimating, policy analysis, and insurance services. In 2024, FEMA awarded contracts to four companies ("Prime Contractors"), including Defendant Fluor Corporation d/b/a Mission Solution ("Fluor" or "Mission Solutions"), to provide TACs with the required specialized professional and technical knowledge needed to administer the Public Assistance Program.

3.    Firms like A2K contract with TACs who have the professional and technical skills desired by FEMA. Upon information and belief, there is no FEMA policy or guideline that restricts the mobility of FEMA TAC subcontractors and/or employees from one FEMA PA TAC IV or V approved subcontractor to another. Stated differently, FEMA does not restrict the movement of

FEMA TAC subcontractors and/or employees within Fluor's team of FEMA PA TAC approved subcontractors.

4.    FEMA issues a Task Order to a Prime Contractor when FEMA determines it needs a TAC with a particular set of specialized professional and/or technical skills. Prime Contractors typically enter subcontracts with various independent subcontracting firms, like A2K, to provide TACs that meet the requirements of FEMA's Task Order. When the Prime Contractor identifies a qualified TAC to fulfill the Task Order, the Prime Contractor will "deploy" that TAC to the assignment. The TAC remains engaged by the subcontracting firm while deployed and submits their timesheets and expenses to their subcontracting firm. The TAC's subcontracting firm then bills Fluor, the Prime Contractor, for the TACs' work and expenses. The Fluor subcontractor pays the TAC for their work and expenses, and then Fluor pays its subcontractors for the billed work. The subcontractors retain a certain monetary portion of the payment as profit.

5.    A2K brings this action against Fluor and one of its subcontractors, Defendant B&H Claims Service, Inc. ("B&H") (collectively with Fluor, the "Defendants"), for their coordinated and exclusionary conduct to eliminate A2K from the Federal Disaster Recovery Servicing Market by barring TACs from seeking disaster relief work with A2K and/or inducing TACs to seek employment through non-A2K subcontractors through dissemination of false information. Fluor used its dominance in the federal disaster recovery work market and conspired with B&H to steal A2K's skilled disaster relief workers (TACs), who had chosen to work for A2K, and forced those TACs to choose between working for other Fluor subcontractors, including B&H, or unemployment. Fluor and B&H conspired to, and as explained below did, steal A2K's only business resource and means to generate revenue and profit in this space: its TACs, which A2K, as recognized by Fluor, has devoted its entire business to attracting, acquiring, and retaining some

of "the best talent in the FEMA [Public Assistance] contracting world."  Fluor and B&H's conduct violates Sherman Act Sections 1 and 2.

6.       In addition, through these and other actions described below, Fluor breached its obligation of good faith and fair dealing with A2K by engaging in deceptive trade practices and intentional fraud to steal A2K's TACs, its only business assets, by barring those TACs from working for A2K despite the TACs' desire to do so and forcing the TACs to either work with other subcontractors, like B&H, or not work at all; as well as inducing A2K's TACs to seek employment elsewhere by disseminating false information about A2K. Defendants also engaged in intentional business interference and interference with a prospective contract that resulted in unjust enrichment by conspiring to steal A2K-aligned TACs and forcing them to work for B&H and other Fluor subcontractors against their desire. Defendants also defamed A2K by disseminating false and misleading information designed to lure A2K-aligned TACs from A2K to B&H and other Fluor subcontractors and ruin A2K's sterling reputation in the federal disaster recovery market.

## II.      PARTIES, JURISDICTION AND VENUE

### A.    The Parties

7.       A2K appears herein as a corporation domiciled in Tennessee, being the state of incorporation and principal place of business.

8.       At all relevant times, Fluor was and is a corporation domiciled in Texas, with its principal place of business located at 6700 Las Colinas Boulevard, Irving, Texas, 75039, and is incorporated under the laws of Delaware, with its registered office located at 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

9.       At all relevant times, B&H was and is a corporation domiciled in North Carolina with its principal place of business in Hayesville, North Carolina, and is incorporated under the

laws of Georgia, with its registered office located at 1615 Hwy 17 Unit #18, Young Harris, Georgia, 30582.

**B.     Jurisdiction and Venue**

10.     This Court has personal jurisdiction over Fluor as it is domiciled within the State of Texas.

11.     This Court has personal jurisdiction over B&H because B&H has sufficient contacts with Texas—such as contracting with Fluor and performing related work—which show it purposefully engaged with the Texas market, and the current claims arise from those contacts.

12.     A2K's federal antitrust claim is instituted under Section 2 of the Sherman Act, 15 U.S.C. § 2. This Court has federal question jurisdiction over this claim pursuant to 28 U.S.C. § 1331 and 1337.

13.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a). A2K, alleges that the amount in controversy exceeds $75,000, exclusive of interest and costs. This allegation is made in good faith based on the damages sought, including but not limited to compensatory damages, consequential damages, and, to the extent permitted by law, exemplary damages and attorney fees, such that the jurisdictional threshold of 28 U.S.C. § 1332(a) is satisfied. The parties are diverse: (a) A2K is a Tennessee corporation with its principal place of business in Tennessee; (b) Defendant Fluor, is a Delaware corporation with its principal place of business in Texas; and (c) Defendant B&H is a Georgia corporation with its principal place of business in North Carolina. The amount in controversy exceeds this Court's jurisdictional limit under 28 U.S.C. § 1332(a). Therefore, the requirements for this Court's jurisdiction are met.

14.     Pursuant to 28 U.S.C.§ 1391(b), venue is proper in this Court.

### III.    FACTUAL BACKGROUND

**A.    A2K's Historical Relationship with Fluor**

15.    Fluor is a global company providing procurement, construction, and project management services for large infrastructure and industrial projects across the world.

16.    Seventeen years ago, A2K began serving as a Fluor subcontractor providing professional disaster recovery labor resources across the country. To date, A2K has served as a subcontractor to Fluor under numerous prime contracts Fluor held with FEMA to provide professional and technical services required to administer the FEMA Public Assistance program.

17.    In 2022, due to A2K's dedication and excellent reputation in the FEMA PA contracting community, Fluor recognized A2K as its "Subcontractor of the Year" nominee and declared that:

> A2K has solidified themselves as the go-to subcontractor for the professional expertise they have provided in support of two Community Disaster Loan (CDL) Program Task Orders. A2K attracts, acquires, and retains some of the best talent in the FEMA PA contracting world. This talent is the reason A2K is able to help Fluor secure competitive FEMA PA contracts. For instance, A2K has strong resources in policy advising, cost estimating, hazard mitigation proposal developing, and engineering (Civil, Coastal, Structural, and more).

**Exhibit 1** – Fluor Press Release "Fluor Mission Solutions Nominates A2K, Inc. for Subcontractor of the Year Award.

**B.    Fluor's Exclusive Prime Contract with FEMA**

18.    Defendant Fluor holds the exclusive right through an indefinite delivery/indefinite quantity ("IDIQ") contract to provide recovery services by TAC under the PA TAC V contract for disasters declared in the East Zone of the United States (the "Fluor Prime Contract"). The East Zone encompasses 14 eastern/southeastern states/areas. *Fluor Selected as FEMA's East Zone Contractor for its Public Assistance Technical Assistance Contracts V*, FLUOR (Feb. 8, 2024),

https://investor.fluor.com/news/news-details/2024/Fluor-Selected-as-FEMAs-East-Zone-Contractor-for-its-Public-Assistance-Technical-Assistance-Contracts-V/default.aspx.

19.     Additionally, Fluor's IDIQ includes any additional recovery services requested by FEMA Headquarters Task Orders. Under this contract, Fluor serves as the Prime Contractor supporting FEMA distribution of Public Assistance following Presidentially declared disasters or emergencies, including the Hermit's Peak/Calf Canyon Fires ("HPCC Fires") which ravaged New Mexico in August 2022. This IDIQ contract has a one-year base period with four one-year option periods. *Id.*

**C.     A2K's Subcontract with Fluor Under the Fluor Prime Contract**

20.     On January 27, 2024, A2K became a subcontractor to Fluor under Fluor's Prime Contract through contract number: FEMAV-A2K1 ("A2K Contract"), entered by A2K and Fluor, doing business as Mission Solutions. The A2K Contract included the same one-year base period with four one-year option periods as Fluor's IDIQ with FEMA.

21.     Fluor circulated to its Fluor Prime Contract subcontractors its "Code of Business Conduct and Ethics," to which it expected its subcontractors to adhere. That Code states in part: "We are fair and ethical in our dealings **with each other** and with third parties. We never make disparaging statements that are false or misleading about competitors or their services – or anything else." *The Code of Business Conduct & Ethics*, FLUOR (July 2025), https://a.fluor.com/f/1014770/x/8e9dec762f/hr700.pdf (emphasis added).

22.     A2K and its TACs entered into independent contractor employment agreements regarding the term of deployment, reimbursement of expenses, rate of pay, and the like ("TAC Contracts"). Even in the absence of written contracts, A2K and its aligned TACs entered into verbal, implied independent contractor employment agreements as evidenced by the parties' conduct.

6

**D.      Fluor Processes for Preparing for and Responding to FEMA PA TAC Task Orders**

23.      Prior to being eligible for deployment under Fluor's IDIQ contract, a TAC chooses which Fluor subcontractor to work for. If the subcontractor agrees to contract with the TAC, the subcontractor will then submit necessary onboarding paperwork including the name, personal information, and resume for that particular TAC candidate to Fluor for processing. A2K personnel spend time and effort gathering required onboarding information, filling out the required forms, coordinating with Fluor, and ensuring all paperwork is accurate and submitted to the appropriate recipient. If a particular TAC candidate desired to move from a separate Prime Contractor to Fluor, a contractor resignation form must be submitted as well.

24.      Once a subcontractor submitted the necessary documents to Fluor for a particular TAC candidate, that TAC was listed on that particular subcontractor's roster, colloquially known as "alignment" with that particular subcontractor. That TAC's roster, or alignment, status would be confirmed in and subsequently tracked by Fluor's internal records by the Fluor Emergency Management Assistance Portal ("FEMAP"), Fluor's online subcontractor management portal. Fluor subcontractors can view FEMAP and verify whether Fluor has an individual listed on their roster and eligible for deployment.

25.      Following Fluor's approval of that TAC as eligible for deployment under the IDIQ contract, the TAC would be submitted through FEMA's security review process. Once that TAC cleared FEMA security review, that TAC would obtain a physical badge card identifying the TAC as a FEMA contractor with Fluor, through the "aligned" subcontractor, which would allow that TAC to be considered for deployment opportunities to perform relief work in certain disaster areas.

26.      Upon receipt of a FEMA Task Order, Fluor would reach out to the subcontractors to review available TACs on their respective rosters in FEMAP and the subcontractors would provide resumes to Fluor of their best available candidates meeting the position descriptions in the

Task Order to fulfill FEMA's request. Once Fluor identified a qualified TAC to fulfill a requested position, Fluor would issue mobilization orders directly to the subcontractor with which that particular TAC was "aligned."  A2K had no guarantee of any candidate selections as Fluor decided which, if any, of the proposed A2K-aligned candidates would be selected for assignment.

27.     FEMA will only deploy a TAC under a single Task Order at any time. Fluor only allows a TAC to be aligned with one subcontractor at any time to avoid having a TAC deployed under two Task Orders at the same time.

28.     The Fluor Prime Contract scope of work is the provision of individuals with specialized professional and technical skills. TACs are therefore a Fluor subcontractor's only business resource and means to generate revenue and profit under the Fluor Prime Contract.

**E.     The HPCC Fires and FEMA PA TAC Contracts**

29.     Between April and August of 2022, the HPCC Fires merged and ravaged certain parts of New Mexico and became New Mexico's largest fire disaster before it was contained in August of 2022. Following the devastating destruction, the Hermit's Peak Fire Assistance Act ("HPFAA") was signed into law by President Biden, providing an estimated $3.95 billion in expedited funding for eligible claims through FEMA.

30.     CH2M Hill – CDM PA TAC Recovery Services ("CCPRS"), a different prime contractor with a separate IDIQ contract with FEMA, also known as PA TAC IV (the "CCPRS Prime Contract"), was awarded the initial Task Order requesting TACs to provide disaster relief services for the HPCC Fires.

31.     In June of 2024, FEMA issued Fluor a Task Order under Fluor's Prime Contract to provide TACs to work on the response to the HPCC Fires. Fluor then began deploying TACs, including A2K-aligned TACs, to the areas affected by the HPCC Fires pursuant to the A2K Contract and FEMA issued Task Orders.

32.     From June 2024 to August 2025, both Fluor and CCPRS, two separate Prime Contractors, provided TACs to support FEMA with the HPCC Fires. A2K believes that B&H served as a CCPRS subcontractor under the CCPRS Prime Contract during this time and did not provide any TACs to Fluor under the Fluor Prime Contract. A2K was and remains a Fluor subcontractor under the Fluor Prime Contract.

**F.    Fluor Becomes the Only Prime Contractor for the HPCC Fires; Fluor Requests A2K to Onboard Additional TACs; and TACs Request to Work with A2K Under Fluor's IDIQ Contract**

33.     On July 22, 2025, Fluor advised its subcontractors (including A2K) that FEMA intended to extend only Fluor's contract for the HPCC Fires relief work for an additional six months past the termination date of August 15, 2025. Fluor also indicated that CPPRS' contract for HPCC relief work would not be extended.

34.     As a result of the expiration of CCPRS' contract for the HPCC Fires, all TACs aligned with CCPRS and its subcontractors, including B&H, were to be demobilized (no longer assigned to work at the HPCC Fires under the CCPRS Prime Contract) no later than August 15, 2025.

35.     Beginning on or around July 23, 2025, and continuing through the days leading up to the expiration of CCPRS' contract, multiple TACs aligned with and actively deployed by CCPRS' subcontractors, including B&H, reached out to Mr. Zachary Wilson of A2K ("Wilson") to discuss resigning from their current subcontractor and re-aligning with A2K since only TACs aligned with Fluor's subcontractors would be eligible to continue the HPCC Fires relief work after August 15, 2025.

36.     Many of these TACs reached out to A2K for work after learning of A2K through word of mouth and sought work with A2K likely due to A2K's excellent reputation, including but not limited to offering competitive wages.

37.    On August 13, 2025, Anthony Cox, the Fluor HPCC Fires Task Order Monitor responsible for overseeing subcontractor staff and personnel management for Fluor ("Fluor Task Order Monitor Cox"), requested that Plaintiff onboard additional TACs from CCPRS for the HPCC Fires relief work.

38.    On August 19, 2025, Wilson submitted a list of approximately thirty-one names, most of whom were former CCPRS TACs that had demobilized from HPCC Fires seeking to transfer badge sponsorship to Fluor via A2K, to Fluor Task Order Monitor Cox for approval for deployment consideration for the HPCC Fires relief work in an email titled "CCPRS Transfer Requests to FLUOR - (HPCC)."

39.    The next day, Fluor Task Order Monitor Cox informed Wilson that FEMA desired sixteen of these individuals to be re-deployed for the HPCC Fires under Fluor, thus confirming that A2K should work to onboard those TACs for alignment with A2K. Fluor Task Order Monitor Cox did not notify A2K that any of the TACs were "aligned" with another Fluor subcontractor or identify any other potential issues with onboarding these TACs.

40.    As this back-and-forth with Fluor Task Order Monitor Cox continued between August 20 and September 4, 2025, A2K submitted the required onboarding information for approximately thirty TACs to Fluor to finalize the transfer of each TAC's badge to Fluor.

41.    At all relevant times described herein, Fluor Task Order Monitor Cox was an employee of Mission Solutions, a division of Fluor, and was acting in the course and scope of his employment. Fluor is vicariously liable for Fluor Task Order Monitor Cox 's conduct.

42.    As late as September 4, 2024, A2K confirmed through FEMAP, Fluor's online subcontractor management portal, that A2K onboarded and Fluor approved at least thirty TACs to be eligible for deployment under the A2K Contract.

43.    A2K entered separate TAC Contracts with each of these A2K-aligned TACs.

44.    A2K expended significant time and resources to onboard additional TACs at Fluor's request. For each TAC A2K submitted for onboarding under the A2K contract, A2K:

(a)    Reviewed the TAC's resume and initiated follow up research and conversations to ensure the candidate possessed the professional and interpersonal skills to succeed under the A2K Contract;

(b)    Interviewed the TAC to discuss potential work opportunities and the expectations of A2K, Fluor, and FEMA should the TAC deploy under a FEMA Task Order;

(c)    Worked with the TAC to obtain all the necessary information to process the individual through FEMA's security clearance protocol. A2K obtained, organized, verified, and uploaded all the required documentation and information through Fluor's secure onboarding portal;

(d)    Assisted each TAC to navigate the complex FEMA background investigation application;

(e)    Acted as the primary point of contact for each TAC throughout the onboarding process;

(f)    Generated a "Fluor formatted" resume for each TAC. The "Fluor formatted" resume is the document A2K generates for each TAC that Fluor then uses to assure FEMA that a TAC meets the position requirements included in a FEMA Task Order; and

(g)    Assisted TACs to prepare for deployment, ensuring they receive all required FEMA training materials and deployment instructions.

**G.    Unbeknownst to A2K, B&H and Fluor Conspired to Steal A2K-Aligned TACs and Force the TACs to Work for Other Fluor Subcontractors, Including B&H, or Not Work at All**

45.    Shortly after being onboarded with A2K, multiple A2K-aligned TACs began receiving messages from Gary Perna, President of B&H ("B&H President Perna"), stating that Fluor moved the TAC's alignment from A2K to B&H without the TACs knowledge or consent. For example, on August 28, 2025, B&H President Perna sent a text message to a A2K-aligned TAC, who had no previous affiliation with B&H, falsely stating that the A2K-aligned TAC was

actually aligned with B&H per "the head woman at Fluor" because "[i]t's the head person that counts."



A true and correct copy of this text message exchange is included as **Exhibit 2.**

46.    At all relevant times described herein, B&H President Perna was an employee of B&H and was acting in the course and scope of his employment. B&H is vicariously liable for B&H President Perna's conduct.

47.    Upon information and belief, Wendy Smith-Reeve, Fluor Executive Director ("Fluor ED Smith-Reeve") is the "head woman at Fluor" referenced in B&H President Perna's text message.

48.    At all relevant times described herein, Fluor ED Smith-Reeve was an employee of Mission Solutions, a division of Fluor, and was acting in the course and scope of her employment. Fluor is vicariously liable for Fluor ED Smith-Reeve's conduct.

49.    For several weeks B&H, through B&H President Perna, repeatedly attempted to lure multiple A2K-aligned TACs with similar false information.

50.    A2K has never had a contractual relationship with B&H.

51.    A2K informed Fluor employees, including Fluor ED Smith-Reeve and Tonya Maloy, Fluor Operations Manager ("Fluor Operations Manager Maloy"), of B&H's attempts to interfere with A2K's contractual relationships with its TACs and Fluor by disseminating false and misleading statements to convince the TACs to join B&H. For example, Wilson sent the below text messages to Fluor ED Smith-Reeve concerning B&H's use of false and misleading information to interfere with A2K's contractual relationship with its TACs and Fluor.





A true and correct copy of the texts between A2K's Wilson and Fluor ED Smith-Reeve is included as **Exhibit 3.**

52.     Furthermore, Fluor ED Smith-Reeve informed Wilson on a phone call that any A2K-aligned TACs would remain with A2K while discussing B&H's misleading and confusing statements to A2K-aligned TACs.

53.     For several weeks in August and early September of 2025, Fluor deceptively refused to address B&H's status as a potential Fluor subcontractor or why B&H President Perna continued to falsely claim that Fluor had moved A2K-aligned TACs to B&H.

54.     Instead, Fluor continued to deceive A2K regarding deployment approval for the TACs that A2K onboarded.

**H.     Fluor Stole A2K-Aligned TACs and Realigned Them With B&H and Other Fluor Subcontractors Against the Will of A2K and A2K-Aligned TACs**

55.     During the August to October 2025 period, Fluor, by itself and/or through B&H, secretly and deceptively removed certain A2K-aligned TACs from A2K's roster to the rosters of other Fluor subcontractors, including B&H's roster. Fluor realigned TACs by (1) providing false and/or misleading information regarding A2K's ability to continue work on the Fluor prime contract, and (2) informing the TACs that they had to move to another subcontractor even when the TACs wanted to continue working for A2K.

56.     Beginning in mid-August 2025, Fluor issued additional Task Orders for work at the HPCC Fires. These additional Task Orders were for resources to replace those that were demobilized following termination of the work under the CCPRS Prime Contract.

57.     Upon information and belief, Fluor issued mobilization orders for A2K-aligned TACs to perform disaster relief work under the newly issued HPCC Fires Task Order. However, instead of properly issuing these mobilization orders to A2K since the TACs were aligned with A2K, these mobilization orders were issued to B&H and other Fluor subcontractors. Fluor's

actions meant that the TAC could only perform the work if they were aligned with B&H or the other subcontractor, not if they remained with A2K as desired.

58.    Upon information and belief, Fluor gave A2K-aligned TACs two choices. The TAC could either (1) leave A2K, join B&H or the other subcontractor, and perform the work; or (2) they could remain with A2K and not work. Neither B&H nor any other subcontractor expended the significant time, money, and effort that A2K did to onboard these TACs and make them eligible for deployment.

59.    Upon information and belief, numerous A2K-aligned TACs wanted to remain with A2K and not join B&H or a different Fluor subcontractor for many reasons, including that A2K's rates may have been more competitive than B&H and other Fluor subcontractors. Many A2K-aligned TACs felt forced to leave A2K and align with a different subcontractor because, if the TAC remained aligned with A2K as desired, Fluor would prevent the TAC from earning a paycheck. A true and correct copy of a text message exchange between Wilson and an A2K-aligned TAC wondering how he ended up aligned with B&H and confirming his desire to work with A2K is included as **Exhibit 4**.



**I.    Fluor Punishes A2K for Alleged Violation of Fluor's TAC Onboarding Policy as Pretense to Bar A2K from Competing in the East Coast Disaster Relief Market**

60.    A2K continued to engage with Fluor about B&H's false and deceptive behavior. . On September 12, 2025, Wilson called Fluor ED Smith-Reeve to rectify the perceived mistakes that led to A2K-aligned staff (that wanted to work for A2K) being moved to other subcontractor rosters. In response, Fluor ED Smith-Reeve accused A2K of failing to onboard TACs that had resigned from B&H in conformance with Fluor's onboarding policy.

61.     Fluor's onboarding policy prohibited subcontractors from onboarding TAC that were already aligned with another Fluor subcontractor. When Wilson reached out to Fluor ED Smith-Reeve by email to discuss the subject, Fluor ED Smith-Reeve's only explanation was that B&H onboarded these particular TACs first; therefore, A2K's actions violated the TAC onboarding policy. However, Fluor ED Smith-Reeve's statements were demonstrably false. Upon information and belief, Fluor did no investigation into whether its accusation was truthful.

62.     B&H did not indicate it was a Fluor subcontractor until September 11, 2025. Rather, prior to September 11, 2025, B&H indicated in multiple communications that it was not yet a Fluor subcontractor. A2K had already onboarded these particular TACs, with Fluor's approval, by September 11, 2025. Furthermore, Fluor did not formally recognize B&H as an official Fluor subcontractor until September 15, 2025. Accordingly, B&H could not have onboarded these A2K-aligned TACs with Fluor prior to A2K.

63.     Additionally, the TACs chose to be aligned with A2K over B&H or other Fluor subcontractors.

64.     Numerous A2K-aligned TACs onboarded by A2K had no prior history or contact with B&H, making it impossible for B&H alone to have onboarded the TACs prior to A2K.

65.     On September 18, 2025, Rene Gimon, Fluor's Contract Manager ("Fluor Contract Manager Gimon"), falsely represented to A2K during a phone call that B&H was added as a Fluor subcontractor during the first week of August 2025. However, B&H was still likely a subcontractor to CCPRS on the CCPRS Prime Contract during the first week of August 2025 because it was providing TACs to HPCC during that timeframe (until the contract ended on August 15, 2025).

66.    At all relevant times described herein, Fluor Contract Manager Gimon was an employee of Mission Solutions, a division of Fluor, and was acting in the course and scope of his employment. Fluor is vicariously liable for Fluor Contract Manager Gimon's conduct.

67.    B&H took advantage of Fluor's secret and dishonest conduct to intimidate A2K-aligned TACs into agreeing to resign from A2K. Specifically, on September 22, 2025, B&H President Perna sent an email to various TACs falsely stating that A2K was no longer part of the HPCC Fires assignment under the Fluor Prime Contract in order to reassign TAC's from A2K to B&H. A true and correct copy of B&H President Perna's September 22, 2025 email transmitting false and damaging information about A2K is attached hereto as **Exhibit 5.**

--------- Forwarded message ---------
From: **Gary Perna** <bhclaims@gmail.com>
Date: Mon, Sep 22, 2025 at 8:22 AM
Subject: HPCC
To:

Just a quick update. As you might be aware FEMA is agonizingly slow in approving people to come back. The good thing is that they want HPCC experienced people.Fluor is submitting people and we wait.

FYI, A2K is no longer part of this project (per Fluor) so if you are waiting for a call on this project from them you might be waiting a long time. Feel free to call us.

Thanks,
--
Gary Perna
B&H Claims Service, Inc.
PO Box 1131
Hayesville, NC 28904
888-574-3467
www.bhclaims.com
*"One Love. One Heart.*
*Let's Get Together and Feel Alright."---Bob Marley*

68.    At the time of B&H President Perna's email, A2K had fifteen TACs deployed under Fluor on the HPCC assignment.

69.    Fluor and B&H's conduct resulted in at least eighteen TACs having no option but to accept the removal from their alignment with A2K under false pretenses so that they could continue to work on the HPCC Fires Task Order for one of Fluor's other subcontractors.

70.     Upon information and belief, numerous A2K-aligned TACs wanted to stay with A2K but were stolen by Fluor from the A2K roster and given no choice but to align with a different Fluor subcontractor, including B&H, or not work under the Fluor Prime Contract.

71.     While Fluor encouraged A2K to onboard additional new TACs in August and September of 2025, Fluor planned on transferring these same TACs to its other subcontractors, including B&H, thus depriving A2K from participating in the disaster relief market and preventing TACs from choosing which subcontractor to work for. Fluor then reaped and continues to reap the benefit of profit derived from the work performed by the stolen TACs as well as the goodwill generated by fulfilling FEMA's Task Order.

## J.     Fluor Formally Restricts A2K's Participation in the Disaster Recovery Market

72.     On September 25, 2025, Risa Abraham, Fluor's Deputy Director of Emergency Management ("Fluor Deputy Director Abraham"), announced in an email to Fluor's subcontractors that Fluor TACs were free to contact any Fluor subcontractor, except for A2K, to discuss re-aligning with a different Fluor subcontractor. Fluor's action (1) restricted the ability of TACs to seek disaster recovery work with A2K; and (2) restricted A2K's ability to participate in the disaster recovery market by preventing A2K from onboarding additional TACs. A true and correct copy of Fluor Deputy Director Abraham's September 25, 2025, email is attached hereto as **Exhibit 6.**

73.     At all relevant times described herein, Fluor Deputy Director Abraham was an employee of Mission Solutions, a division of Fluor, and was acting in the course and scope of her employment. Fluor is vicariously liable for Fluor Deputy Director Abraham's conduct.

74.     Upon information and belief, Fluor intended Fluor Deputy Director Abraham's email to persuade TACs interested in pursuing opportunities with A2K to re-align with other

subcontractors as punishment for A2K allegedly failing to onboard former B&H TACs in conformance with Fluor's onboarding policy.

75.    Later that same day, Fluor Contract Manager Gimon informed A2K by letter that Fluor would no longer approve any new TACs onboarded by A2K for any disaster relief work. A true and correct copy of Fluor Contract Manager Gimon's September 25, 2025, letter is attached hereto as **Exhibit 7.**

76.    Furthermore, Fluor Contract Manager Gimon concluded the letter by informing A2K that Fluor, for the first time, now has the ability to unilaterally transfer TACs onboarded by A2K, including TACs that wanted to remain aligned with A2K, to other Fluor subcontractors like B&H.

77.    Thus, Fluor ensured that once A2K's deployed TACs completed their deployments, A2K could never participate in the East Zone disaster relief market again while also eliminating a subcontractor for TACs to seek work.

**K.    Fluor Stole A2K-Aligned TACs from A2K and Required Those TACs to Deploy with B&H or Other Fluor Subcontractors**

78.    On information and belief, Fluor barred approximately twenty-six A2K-aligned TACs from working for A2K against the will of those A2K-aligned TACs from approximately September 12th to October 6th, 2025. Fluor, instead, required the TACs to work for a different subcontractor, including B&H; otherwise, the TACs would no longer be eligible to be deployed under the Fluor Prime Contract and consequently, the TAC would lose their job.

79.    Fluor's actions to bar TACs who wanted to work for A2K from doing so deprived A2K of any future revenue associated with the TACs' work.

80.     Given that Fluor could have used the TACs onboarded by A2K on the A2K Contract, as it had under similar contracts over the past seventeen years, Fluor's clear intent was not to acquire and use the TACs' talents, but rather to deny them to A2K.

81.     B&H benefited from the conspiracy and actions of hiring away A2K's TACs by acquiring the revenue and profit from the TACs being switched to B&H's roster and pushing A2K out of the disaster relief market, thereby lessening B&H's competition for TACs.

82.     CCPRS subcontractors, including B&H, could no longer deploy TACs to perform relief work for the HPCC Fires following August 15, 2025. Fluor therefore knew B&H's false and misleading statements were solely to deploy these TACs with Fluor, as Fluor was the only Prime Contractor engaged by FEMA to provide resources for the HPCC Fires Task Order beyond August 15, 2025.

83.     Fluor deceived A2K as to the status of its TACs while knowing B&H was disseminating false statements to A2K's TACs in concert to steal them from A2K.

84.     In addition, Fluor continued to deceive A2K into believing that the A2K-aligned TACs were secure in their work with A2K, all the while working in concert with B&H to steal those TACs.

### IV.    CLAIMS FOR RELIEF

**Count I**
**Fluor and B&H's Conspiracy to Monopolize in Violation of Sherman Act**
**Section 1 (15 U.S.C. § 1)**

85.     A2K repeats and realleges all of the foregoing and subsequent allegations as if fully set forth herein.

86.     Beginning at a time currently unknown to A2K, but at least as early as August 15, 2025, and continuing through the present, Defendants and their co-conspirators entered into an agreement to regularly exchange detailed timely, competitively sensitive and non-public

information about their operations. This agreement is concerted action and an unreasonable restraint on trade in violation of Sherman Act Section 1 (15 U.S.C. § 1).

87.    The relevant market is Federal Emergency Relief Services in the "East Zone" of the United States, which includes FEMA Regions 3 and 4 (encompassing fourteen states in the eastern and southeastern United States).

**Count II**
**Fluor and B&H's Conspiracy to Monopolize in Violation of Sherman Act**
**Section 2 (15 U.S.C. § 2)**

88.    A2K repeats the allegations set forth above as if fully set forth herein.

89.    Defendants Fluor and B&H's conduct constitute unlawful monopolization and conspiracy to monopolize under Sherman Act Section 2, 15 U.S.C. § 2.

90.    Fluor possesses monopoly power or a dangerous probability of monopoly power in the East Zone disaster relief work market. Fluor holds the exclusive right through an IDIQ contract to provide disaster recovery services to FEMA under the Fluor Prime Contract for the East Zone, comprised of FEMA Regions 3, 4, and Headquarters Task Orders (*i.e.*, HPCC Fires). Subcontractors, like A2K, can only access this market through Fluor, creating insurmountable barriers to entry.

91.    Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination, and conspiracy to monopolize the East Zone disaster relief work market in violation of Sherman Act Section 2, 15 U.S.C. § 2.

92.    Defendants have taken and are taking overt acts in furtherance of their conspiracy to unlawfully prevent A2K from participating in the East Zone disaster relief work market, including but not limited to: requesting that A2K invest time, energy, and resources into recruiting, vetting, hiring, and onboarding TACs for its roster that Fluor intended to steal from A2K, against

the TACs desire, and force the TACs to re-align with B&H or a different subcontractor or otherwise no longer be eligible to work; falsely claiming that B&H had a subcontract with Fluor, when it did not, to justify stealing A2K's TACs and prevent A2K from participating in the federal disaster relief market; unlawfully interfering with the A2K Contract by contacting and disseminating false and misleading statements to A2K-aligned and potential future A2K-aligned TACs with the intent to influence their decision to remain aligned with A2K and stealing A2K-aligned TACs from A2K's roster forcing the TACs to align with the rosters of other Fluor subcontractors, including B&H's roster; falsely claiming that the TACs onboarded by A2K during the August-October 2025 time period were previously onboarded by B&H under the Fluor Prime Contract; deploying the previously A2K-aligned TACs to the HPCC fires under subcontracts with B&H or other subcontractors; falsely claiming that A2K was no longer part of the HPCC project in an email to various TACs dated September 22, 2025; and breaching the A2K Contract by telling B&H and other Fluor subcontractors that Fluor would no longer approve any new TACs onboarded by A2K.

93.    The purpose of Defendants' conspiracy is an exclusionary scheme in which Defendants remove the TACs from A2K and/or deny those TACs from A2K, thereby conspiring to achieve monopoly control over disaster relief work in the East Zone and effect a substantial amount of interstate commerce.

94.    A2K has suffered and will continue to suffer injury to its business and property as a direct and proximate result of Defendants' unlawful conduct.

95.    The relevant market is Federal Emergency Relief Services, and the geographic market is the East Zone in the United States.

96.     A2K is entitled to treble damage, attorney fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

**Count III**
**Fluor's Breach of Contract**

97.     A2K repeats the allegations set forth above as if fully set forth herein.

98.     A2K expended significant money and resources to onboard TACs including reviewing resumes, interviewing TACs, verifying and uploading all required onboarding documentation to Fluor's onboarding system; obtaining all required information for FEMA's security clearance process, assisting the TACS to navigate the complex FEMA security clearance process, generating Fluor formatted resumes, ensuring all TACs received and reviewed all FEMA required training materials, and serving as the primary point of contact for each TAC through the onboarding process.

99.     Fluor intentionally, willfully, and maliciously breached its obligations of good faith and fair dealings with A2K, including, but not limited to, accusing A2K of violating its TAC onboarding policy, without evidence, as an excuse to bar A2K-aligned TACs from working for A2K and forcing them to choose between working for a separate subcontractor, including B&H, or not working under the Fluor Prime Contract at all (thereby facing unemployment). Fluor also prohibited prospective TAC from seeking work opportunities with A2K without justification, effectively excluding A2K from the Federal Emergency Relief Services market.

100.     As a direct and proximate result of Fluor's intentional, willful, and malicious conduct, A2K lost the value of work performed to onboard the TACs; as well as all realized and future profits associated with the disaster relief work performed and will be performed in the future by the A2K-aligned TAC and prospective TAC that were unduly influenced by Fluor's bad faith actions.

101.    Fluor has intentionally and willfully breached the A2K Contract in bad faith, entitling A2K to compensatory damages, including indirect damages for reasonably foreseeable harm resulting from the breach, punitive damages, non-foreseeable damages, and reasonable attorney's fees pursuant to Tex. Civ. Prac. & Rem. § 38.001.

### Count IV
### B&H's Unjust Enrichment

102.    A2K repeats the allegations set forth above as if fully set forth herein.

103.    B&H conspired with Fluor to steal A2K-aligned TACs and force those TACs to align with B&H or not work in the disaster relief market under the Fluor Prime Contract.

104.    B&H knowingly disseminated false information regarding A2K's status as a Fluor subcontractor, including A2K's ability to onboard and deploy TACs, to induce A2K-aligned TACs to leave A2K and align with B&H as well as unduly influence prospective TACs to avoid working with A2K and instead join B&H.

105.    A2K expended significant money and resources to onboard TACs including reviewing resumes, interviewing TACs, verifying and uploading all required onboarding documentation to Fluor's onboarding system; obtaining all required information for FEMA's security clearance process, assisting the TACS to navigate the complex FEMA security clearance process, generating Fluor-formatted resumes, ensuring all TACs received and reviewed all FEMA required training materials, and serving as the primary point of contact for each TAC through the onboarding process.

106.    As a direct and proximate result of B&H's conduct, A2K lost the value of work performed to onboard the TACs and all realized and future profits associated with the disaster relief work performed and will be performed in the future by the A2K-aligned TACs and prospective TACs that were unduly influenced by B&H's dissemination of false information.

107.   B&H obtained the value of A2K's onboarding efforts as well as the profits earned and will be earned in the future by the TACs it aligned with as a result of conspiring to steal the TACs and disseminating false information to induce TACs to align with B&H instead of A2K.

108.   A2K and B&H have no prior contractual history, and justice requires equitable relief in an amount of damages to be proven at trial.

109.   In the alternative to Count III, Fluor has been unjustly enriched by means of fraud, duress, and/or undue advantage by accusing A2K of violating its TAC onboarding policy, without evidence, as an excuse to bar A2K-aligned TACs from working for A2K and forcing them to choose between working for a separate subcontractor, including B&H, or not working under the Fluor Prime Contract at all (thereby facing unemployment). Fluor also prohibited prospective TACs from seeking work opportunities with A2K without justification, effectively excluding A2K from the Federal Emergency Relief Services market.

110.   As a direct and proximate result of Fluor's intentional, willful, and malicious conduct, A2K lost the value of work performed to onboard the TACs; as well as all realized and future profits associated with the disaster relief work performed and will be performed in the future by the A2K-aligned TACs and prospective TACs that were unduly influenced by Fluor's bad faith actions.

111.   Fluor has secured increased profits and other tangible benefits by its conduct described herein, including but not limited to, conspiring with B&H to steal A2K-aligned TACs.

112.   Alternatively, Fluor passively benefited from B&H's conduct described herein.

113.   It would be unjust and unconscionable for Fluor to retain the monies and benefits obtained from its conduct.

114.    Fluor's conduct has directly and proximately caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits as well as any and all such other damages that may be proven at trial.

115.    By engaging in the conduct described herein, B&H has been unjustly enriched by means of fraud, duress, and/or undue advantage.

116.    B&H has secured increased profits and other tangible benefits by its conduct described herein, including, but not limited to, conspiring with Fluor to steal A2K-aligned TACs.

117.    It would be unjust and unconscionable for B&H to retain the monies and benefits obtained from its conduct.

118.    B&H's conduct has directly and proximately caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits as well as any and all such other damages that may be proven at trial.

**Count V**
**Detrimental Reliance on Fluor's Promises**

119.    A2K repeats the allegations set forth above as if fully set forth herein. and realleges all of the foregoing and subsequent allegations as if fully set forth herein.

120.    In the alternative to Count III, A2K reasonably relied on Fluor's promises to its detriment.

121.    Fluor made certain implied and express promises to A2K, including, but not limited to, encouraging A2K to continue onboarding TACs, thus implicitly promising that those newly onboarded TACs would be aligned with A2K, and expressly promising that those TACs would remain with A2K.

122.    Fluor expected A2K to rely upon its promises on account of the seventeen-year business relationship.

123.    A2K reasonably relied on Fluor's promises based on its seventeen-year history with Fluor by expending significant money and resources to onboard TACs including reviewing resumes, interviewing TACs, verifying and uploading all required onboarding documentation to Fluor's onboarding system; obtaining all required information for FEMA's security clearance process, assisting the TACS to navigate the complex FEMA security clearance process, generating Fluor-formatted resumes, ensuring all TACs received and reviewed all FEMA required training materials, and serving as the primary point of contact for each TAC through the onboarding process. As a direct and proximate result of Fluor's intentional, willful, and malicious conduct, A2K lost the value of work performed to onboard the TACs; as well as all realized and future profits associated with the disaster relief work performed and will be performed in the future by the A2K-aligned TACs and prospective TACs that were unduly influenced by Fluor's bad faith actions.

124.    Substantial injustice would be avoided by enforcing Fluor's promises and affirmations described herein, including, but not limited to, promises that all TACs onboarded by A2K would remain with A2K.

125.    Fluor's conduct has directly and proximately caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits as well as any and all such other damages that may be proven at trial.

**Count VI**
**Fluor and B&H's Tortious Interference with an Existing Contract**

126.    A2K repeats the allegations set forth above as if fully set forth herein. At the time of Fluor's unlawful conduct described herein, A2K and multiple A2K-aligned TACs had entered various written and verbal TAC Contracts.

127.    Fluor intentionally and maliciously interfered with multiple TAC Contracts by engaging in the deceitful, defamatory, and/or dishonest conduct described herein, including, but not limited to, accusing A2K of violating its TAC onboarding policy, without evidence, as an excuse to bar A2K-aligned TACs from working for A2K and forcing them to choose between working for a separate subcontractor, including B&H, or not work under the Fluor Prime Contract. Fluor also prohibited prospective TAC from seeking work opportunities with A2K without justification, effectively excluding A2K from the Federal Emergency Relief Services market.

128.    As a direct and proximate result of Fluor's intentional, willful, and malicious conduct, A2K lost the value of work performed to onboard the TACs; as well as all realized and future profits associated with the disaster relief work performed and will be performed in the future by the A2K-aligned TACs and prospective TACs that were unduly influenced by Fluor's bad faith actions.

129.    A2K is entitled to compensatory damages as well as punitive and/or exemplary damages for Fluor's knowing, intentional, and malicious conduct that interfered with multiple TAC Contracts to include A2K's court costs and attorneys' fees.

130.    At the time of B&H's unlawful conduct described herein, Fluor and A2K were parties to a valid and existing contract; and A2K and multiple A2K-aligned TACs were parties various written and verbal TAC Contracts.

131.    B&H maliciously, willfully, and intentionally interfered with the A2K Contract by disseminating false information to induce A2K-aligned TACs to leave A2K and align with B&H as well as unduly influencing prospective TACs to avoid working with A2K and instead join B&H.

132.    As a direct and proximate result of B&H's conduct, A2K lost the value of work performed to onboard the TACs and all realized and future profits associated with the disaster

relief work performed and will be performed in the future by the A2K-aligned TACs and prospective TACs that were unduly influenced by B&H's dissemination of false information.

133.    A2K is entitled to compensatory damages as well as punitive and/or exemplary damages for B&H's knowing, intentional, and malicious conduct that interfered with the A2K Contract to include A2K's court costs and attorneys' fees.

134.    B&H maliciously, willfully, and intentionally interfered with multiple TAC Contracts when it knowingly disseminated false information regarding A2K's status as a Fluor subcontractor, including A2K's ability to onboard and deploy TACs, to induce A2K-aligned TACs to leave A2K and align with B&H as well as unduly influence prospective TACs to avoid working with A2K and instead join B&H.

135.    As a direct and proximate result of B&H's intentional, willful, and malicious conduct, A2K lost the value of work performed to onboard the TACs; as well as all realized and future profits associated with the disaster relief work performed and will be performed in the future by the A2K-aligned TACs and prospective TACs that were unduly influenced by B&H's malicious and intentional conduct.

136.    A2K is entitled to compensatory damages as well as punitive and/or exemplary damages for B&H's knowing, intentional, and malicious conduct that interfered with multiple TAC Contracts to include A2K's court costs and attorneys' fees.

## Count VII
### Fluor and B&H's Tortious Interference with a Prospective Contract

137.    A2K repeats the allegations set forth above as if fully set forth herein.

138.    Fluor intentionally and maliciously interfered with multiple prospective TAC Contracts by engaging in the deceitful, defamatory, and/or dishonest conduct described herein, including, but not limited to, accusing A2K of violating its TAC onboarding policy, without

evidence, as an excuse to bar A2K-aligned TACs from working for A2K. Fluor also prohibited prospective TACs from seeking work opportunities with A2K without justification, effectively excluding A2K from the Federal Emergency Relief Services market and ended the prospect of any future TAC Contracts.

139.    But for Fluor's knowing, intentional, and malicious conduct described herein that was and is substantially likely to prevent future business between A2K and A2K-aligned TACs, there was a reasonable probability that additional TAC Contracts would have been entered into between A2K and A2K-aligned TACs related to disaster relief work consistent with the prior seventeen years of A2K's business as well as the multiple TAC wanting to enter TAC Contracts with A2K just prior to Fluor's knowing, intentional, and malicious conduct.

140.    Fluor's intentional and malicious conduct to interfere with multiple prospective TAC Contracts is independently tortious as fraud.

141.    As a direct and proximate result of Fluor's intentional, willful, and malicious conduct, A2K lost the value of future profits associated with the disaster relief work performed by prospective TACs that were unduly influenced by Fluor's bad faith actions to not enter a TAC Contract with A2K.

142.    A2K is entitled to compensatory damages as well as punitive and/or exemplary damages for Fluor's knowing, intentional, and malicious conduct that interfered with multiple prospective TAC Contracts to include A2K's court costs and attorneys' fees.

143.    But for B&H's intentional and malicious conduct described herein, including disseminating false information regarding A2K's standing as a Fluor subcontractor and ability to deploy TACs under the Fluor Prime Contract to induce A2K-aligned TAC to leave A2K and align with B&H as well as unduly influencing prospective TACs to avoid working with A2K and instead

join B&H, there was a reasonable probability that Fluor would have exercised the remaining Options under the A2K Contract as has been the course of dealing between Fluor and A2K over the past seventeen years, increasing the value of the contract by millions of dollars for each Option period.

144.    B&H's intentional and malicious conduct to interfere with prospective contracts between A2K and Fluor is independently tortious as business disparagement and/or defamation.

145.    As a direct and proximate result of B&H's intentional, willful, and malicious conduct, A2K lost the value of future profits associated with the disaster relief work performed under the current and future options to the A2K Contract.

146.    A2K is entitled to compensatory damages as well as punitive and/or exemplary damages for B&H's knowing, intentional, and malicious conduct that interfered with the A2K Contract to include A2K's court costs and attorneys' fees.

147.    B&H maliciously, willfully, and intentionally interfered with multiple prospective TAC Contracts when it knowingly disseminated false information regarding A2K's status as a Fluor subcontractor, including A2K's ability to onboard and deploy TACs. This conduct ended the prospect of any future TAC Contracts.

148.    But for B&H's knowing, intentional, and malicious conduct described herein that was and is substantially likely to prevent future business between A2K and A2K-aligned TACs, there was a reasonable probability that additional TAC Contracts would have been entered into between A2K and A2K-aligned TACs related to disaster relief work consistent with the prior seventeen years of A2K's business as well as the multiple TAC wanting to enter TAC Contracts with A2K just prior to Fluor's knowing, intentional, and malicious conduct.

149.    B&H's intentional and malicious conduct that interfered with multiple prospective TAC Contracts is independently tortious as business disparagement and/or defamation.

150.    As a direct and proximate result of B&H's intentional, willful, and malicious conduct, A2K lost the value of future profits associated with the disaster relief work performed by prospective TACs that were unduly influenced by B&H's conduct to not enter a TAC Contract with A2K.

151.    A2K is entitled to compensatory damages as well as punitive and/or exemplary damages for Fluor's knowing, intentional, and malicious conduct that interfered with multiple prospective TAC Contracts to include A2K's court costs and attorneys' fees.

## Count VIII
## Fluor's Intentional Fraud

152.    A2K repeats the allegations set forth above as if fully set forth herein. By engaging in the conduct described herein, Fluor made multiple material misrepresentations, including, but not limited to, requests to continue onboarding new TACs while assuring A2K that those TACs would remain aligned with A2K, that were significant enough to influence A2K's business decisions.

153.    The material representations made by Fluor were objectively false at the time they were made, including, but not limited to, Fluor not stealing new onboarded A2K-aligned TACs.

154.    Alternatively, Fluor made assurances for future performances, including keeping all of the A2K-aligned TACs with A2K, that Fluor had no intention of keeping unless those TACs were aligned with Fluor subcontractors other than A2K.

155.    Fluor knew the representations described herein that it made to A2K were false.

156.    Alternatively, Fluor recklessly, and without any regard for the truth, made the representations described herein.

157.   Fluor, acting through its agents, including Fluor ED Smith-Reeve and Fluor Task Order Manager Cox, intended for A2K to rely upon its material misrepresentations.

158.   A2K did rely on Fluor's promises by expending its resources, including reviewing resumes, interviewing TACs, verifying and uploading all required onboarding documentation to Fluor's onboarding system; obtaining all required information for FEMA's security clearance process, assisting the TACS to navigate the complex FEMA security clearance process, generating Fluor formatted resumes, ensuring all TACs received and reviewed all FEMA required training materials, and serving as the primary point of contact for each TAC through the onboarding process at Fluor's request only for Fluor to steal those same TACs after being onboarded.

159.   A2K was justified in relying upon Fluor's material misrepresentations as it had a productive seventeen-year business relationship with Fluor with no prior indications of fraudulent conduct by Fluor.

160.   As a direct and proximate result of Fluor's intentional, willful, and malicious conduct, A2K lost the value of work performed to onboard the TACs; as well as all realized and future profits associated with the disaster relief work performed and will be performed in the future by the A2K-aligned TACs and prospective TACs that were unduly influenced by Fluor's bad faith conduct.

161.   Due to Fluor's intentionally fraudulent, malicious, and egregious conduct, A2K is entitled to compensatory damages, including indirect damages for reasonably foreseeable harm resulting from the breach, punitive damages, non-foreseeable damages, and reasonable attorney's fees.

**Count IX**
**Fluor's Negligent Misrepresentation**

162.    A2K repeats the allegations set forth above as if fully set forth herein. In the alternative, Fluor engaged in negligent misrepresentation. By engaging in the conduct described herein, Fluor made multiple material misrepresentations, including, but not limited to, requests to continue onboarding new TACs while assuring A2K that those TACs would remain aligned with A2K consistent with A2K's seventeen-year history with Fluor, that were significant enough to influence A2K's business decisions.

163.    The material representations made by Fluor were objectively false at the time they were made, including, but not limited to, requests to continue onboarding new TACs while assuring A2K that those TACs would remain aligned with A2K.

164.    Alternatively, Fluor made assurances for future performances, including keeping all of the A2K-aligned TACs with A2K, that Fluor had no intention of keeping.

165.    Fluor did not exercise reasonable care in determining the truth of its material misrepresentations.

166.    Fluor, acting through its agents including Fluor ED Smith-Reeve and Fluor Task Order Manager Cox, intended for A2K to rely upon its material misrepresentations.

167.    A2K relied upon Fluor's material misrepresentations by expending its resources, including reviewing resumes, interviewing TACs, verifying and uploading all required onboarding documentation to Fluor's onboarding system; obtaining all required information for FEMA's security clearance process, assisting the TACS to navigate the complex FEMA security clearance process, generating Fluor formatted resumes, ensuring all TACs received and reviewed all FEMA required training materials, and serving as the primary point of contact for each TAC through the

onboarding process at Fluor's request only for Fluor to steal those same TACs after being onboarded.

168.    A2K was justified in relying upon Fluor's material misrepresentations as it had a productive seventeen-year business relationship with Fluor with no prior indications of fraudulent conduct by Fluor.

169.    Fluor's negligently fraudulent conduct has directly and proximately caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits to A2K as well as any and all such other damages that may be proven at trial.

**Count X**
**Fluor and B&H's Civil Conspiracy**

170.    A2K repeats the allegations set forth above as if fully set forth herein. By engaging in the conduct described herein to steal A2K-aligned TACs and exclude A2K from further work under the Fluor Prime Contract, Fluor and B&H have engaged in a civil conspiracy to commit fraud, interference with business relations, interference with prospective business relations, defamation, and business disparagement on A2K.

171.    Fluor and B&H agreed to steal A2K-aligned TACs, nullify existing TAC Contracts, prevent formation of future TAC Contracts, and exclude A2K from the Federal Emergency Relief Services market, and damage A2K's reputation by means of committing fraud, interference with business relations, interference with prospective business relations, defamation, and business disparagement to A2K.

172.    By engaging in the conduct described herein, Fluor and B&H have engaged in multiple unlawful and overt acts to commit fraud, interference with business relations, interference with prospective business relations, defamation, and business disparagement to A2K.

173.    Fluor's conduct has directly and proximately caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits to A2K as well as any and all such other damages that may be proven at trial.

174.    B&H's conduct has directly and proximately caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits to A2K as well as any and all such other damages that may be proven at trial.

175.    A2K is entitled to punitive damages for Fluor and B&H's intentionally fraudulent and malicious conduct pursuant to Tex. Civ. Prac. & Rem. § 41.

**Count XI**
**Fluor and B&H's Defamation**

176.    A2K repeats the allegations set forth above as if fully set forth herein. Fluor falsely accused A2K of violating its onboarding policy as an excuse to bar A2K from the East Coast disaster relief industry TAC's aligned other subcontractors without any factual basis.

177.    On information and belief, Fluor has repeated this demonstrably false claim to others in the disaster relief community, including multiple TACs and other subcontractors of Fluor.

178.    Fluor intentionally communicated these false claims against A2K by failing to perform any due diligence and investigating these claims before communicating these claims to others, thereby damaging A2K's reputation, standing, and goodwill.

179.    In addition, and in the alternative, Fluor negligently communicated the false accusations against A2K of violating its onboarding policy as an excuse to bar A2K from the East Coast disaster relief industry by failing to perform any due diligence and investigating into this claims before communicating this claim to others, thereby damaging A2K's reputation, standing, and goodwill.

180.    Fluor's conduct has directly and proximately caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits to A2K as well as any and all such other damages that may be proven at trial.

181.    B&H intentionally communicated false information to others in the disaster relief community, including multiple TACs, including A2K-aligned TACs, and other subcontractors of Fluor.

182.    B&H's intentionally false communications about A2K's status as Fluor subcontractor for the HPCC Fires and ability of A2K-aligned TACs to deploy for FEMA assignments damaged A2K's reputation, standing, and goodwill.

183.    In addition, and in the alternative, B&H negligently communicated the false information against A2K by failing to perform any due diligence and investigating these claims before communicating these claims to others, including A2K-aligned TACs, thereby damaging A2K's reputation, standing, and goodwill.

184.    B&H's conduct has directly and proximately caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits to A2K as well as any and all such other damages that may be proven at trial.

**Count XII**
**Fluor and B&H's Business Disparagement**

185.    A2K repeats the allegations set forth above as if fully set forth herein. Fluor falsely accused A2K of violating its onboarding policy as an excuse to bar A2K from the East Coast disaster relief industry.

186.    On information and belief, Fluor has published this demonstrably false claim to others in the disaster relief community, including multiple TACs and other subcontractors of Fluor.

187.    Fluor intentionally published these false claims against A2K by failing to perform any due diligence and investigating these claims before communicating these claims to others, thereby damaging A2K's reputation, standing, and goodwill.

188.    On information and belief, Fluor maliciously and without privilege published the false accusations against A2K of violating its onboarding policy as an excuse to bar A2K from the East Coast disaster relief industry thereby damaging A2K's reputation, standing, and goodwill.

189.    Fluor's conduct has directly and proximately caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits to A2K as well as any and all such other damages that may be proven at trial.

190.    B&H intentionally and maliciously published false information regarding A2K's status as a Fluor subcontractor and ability to deploy TACs under the Fluor Prime Contract to others in the disaster relief community, including multiple TACs, including A2K-aligned TACs, and other subcontractors of Fluor.

191.    B&H's intentional and malicious false published communications about A2K's status as Fluor subcontractor for the HPCC Fires and ability of A2K-aligned TACs to deploy for FEMA assignments damaged A2K's reputation, standing, and goodwill.

192.    B&H's conduct has directly and proximately caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits to A2K as well as any and all such other damages that may be proven at trial.

### Count XIII
### B&H's Unfair Competition by Common Law Misappropriation

193.    A2K repeats the allegations set forth above as if fully set forth herein. Fluor falsely accused A2K of violating its onboarding policy as an excuse to bar A2K from the East Coast disaster relief industry.

194.    A2K expended extensive time, labor and money to prepare and onboard TAC that could provide services under the Fluor Prime Contract including reviewing resumes, interviewing TACs, verifying and uploading all required onboarding documentation to Fluor's onboarding system; obtaining all required information for FEMA's security clearance process, assisting the TACS to navigate the complex FEMA security clearance process, generating Fluor formatted resumes, ensuring all TACs received and reviewed all FEMA required training materials, and serving as the primary point of contact for each TAC through the onboarding process.

195.    B&H then stole these same TACs and used them in competition against A2K. B&H received a free ride because it was not burdened with any of the expense incurred by A2K to onboard and prepare the TACs for deployment under the Fluor Prime Contract.

196.    B&H's use of A2K's TACs caused past, present, and future irreparable harm, loss of goodwill, loss of standing, loss of revenue, and loss of profits to A2K as well as any and all such other damages that may be proven at trial.

## V.    PRAYER FOR RELIEF

**WHEREFORE**, A2K respectfully requests:

a.    The Court adjudge and decree that Defendants' acts are illegal and unlawful under Sherman Act Sections 1 and 2.

b.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons action or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

c.  The Court enter judgment against Defendants, jointly and severally, and in favor of A2K for relief the amount of damages sustained by A2K as allowed by law, together with costs of the action, including reasonable attorney fees, pre-and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

d.  The Court award Plaintiffs such other further relief as the case may require and the Court may deem just and proper under the circumstances.

## VI.    JURY TRIAL DEMANDED

A2K demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Date: January 27, 2026                     Respectfully submitted,

**BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC**

By: */s/Ferdose al-Taie*

**FERDOSE AL-TAIE** (TX Bar #24106644)
5956 Sherry Lane, 20th Floor
Dallas, TX  75225
(214) 301-7210   faltaie@bakerdonelson.com

**BENJAMIN W. JANKE** (LA Bar #31796)
(pending *pro hac vice* admission)
201 St. Charles Ave., Ste. 3600
New Orleans, LA 70170
(504) 566-5200 bjanke@bakerdonelson.com

**BETHANY CARROLL** (GA Bar #406997)
(pending *pro hac vice* admission)
3414 Peachtree Rd NE, Ste. 1500
Atlanta, GA 30326
(404) 223-2209 bcarroll@bakerdonelson.com

**CHRIS BOMHOFF** (FL Bar #1059470)
(pending *pro hac vice* admission)
200 East Broward Blvd**.,** Ste. 2000
Ft. Lauderdale, FL 33301
(954) 768-1630   cbomhoff@bakerdonelson.com

***ATTORNEYS FOR A2K, INC.***